**UNITED STATES of America, Plaintiff,**

v.

**Irwin DAVIDSON, Defendant.**

**No. 98 CR. 790(CM).**

United States District Court, S.D. New York.

March 18, 2004.

Brian D. Linder, Clayman & Rosenberg, Richard A. Finkel, Meissner, Kleinberg, & Finkel, Stuart E. Abrams, Frankel & Abrams, Maurice H. Sercarz, New York, NY, Jared J. Scharf, White Plains, NY, Patrick T. Burke, Suffern, NY, for Defendant.

William C. Silverman, U.S. Attorney Office, White Plains, NY, for Plaintiff.

## DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

MCMAHON, District Judge.

Defendant Irvin Davidson was convicted in 1999 of one count of conspiracy to commit tax fraud, three counts of money laundering, eight counts of wire fraud and three counts of income tax evasion. His convictions were affirmed by the United States Court of Appeals for the Second Circuit, *United States v. Davidson,* 26 Fed.Appx. 64 (2d Cir.2001).

Davidson now moves for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, on the ground that the Government violated its obligation to turn over exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83

S.Ct. 1194, 10 L.Ed.2d 215 (1963). The material in question consists of approximately 500 pages of documents and notes that were in a file created and maintained by the Federal Bureau of Investigation's Houston, Texas office during 1994–95. At that time, Davidson was the subject of a complaint concerning a transaction that involved him, and enterprise called J & T (for Joschko and Tschacher, its principals), and the Texas Commerce Bank (TCB). The underlying transaction involving Davidson and J & T (whose complaint instigated the creation of the FBI: Houston file) was challenged as fraudulent under this indictment, and the proceeds Davidson realized from his alleged fraud were the subject of a money laundering count as well.

Davidson was aware of the existence of the FBI: Houston investigation, because his then lawyer had sent documents to Scharlene Fox, the FBI agent in charge of the case. Through his counsel, defendant asked repeatedly for its production before and during his trial. The Government produced a few documents obtained from FBI: Houston (fewer than 20 pages) and advised both defendant and the Court that the rest of the file had been destroyed in a routine document purge.

After his conviction, Davidson persisted in his efforts to locate the missing file. His persistence paid off in 2002 when a FOIA request addressed to the FBI resulted in the production of 464 pages of documents—Agent Fox's entire file on the J & T/TCB matter. The file so produced included the few documents that Davidson's counsel had received in discovery before and during the trial, but it held hundreds of other pages as well. Among them was a memorandum from Agent Fox recounting her conclusion that the file should be closed administratively because the evidence submitted to her did not demonstrate criminality.

The instant motion for relief from judgment and a new trial followed, premised on the Government's alleged failure to produce *Brady* material. Defendant also argues, based on the content of the file, that the Government deliberately presented perjured testimony from Joschko at his trial. The Government argues that the additional material is not new, does not exculpate the defendant and would not have cause the jury to return a different verdict.

For the reasons that follow, the motion is denied.

### Rule 33 Motion: Standard for Relief

A motion for a new trial made pursuant to Rule 33 "based upon previously undiscovered evidence is ordinarily not favored and should be granted only with great caution." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996). Indeed, a district court may grant the motion only in "the most extraordinary circumstances." *United States v. Petrillo*, 237 F.3d 119, 123 (2d Cir.2000); *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir.1999).

A new trial is warranted under *Brady v. Maryland* when the Government has failed to disclose material evidence that was favorable to the accused. Evidence is "favorable" if it is exculpatory or if it could have been used to impeach other evidence relied on by the Government. Evidence is "material" if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict, *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996), or where its admission "would probably lead to an acquittal." *United States v. Siddiqi*, 959 F.2d 1167,-1173 (2d Cir.1992). Materiality is assessed in light of the totality of the trial evidence. Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin. *Unit-*

ed States v. Gil, 297 F.3d 93, 103 (2d Cir.2002).

■ The standard for granting a new trial for *Brady* violations is whether there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). To find a *Brady* violation, a court need not conclude that the undisclosed evidence would have been admissible at trial. Rather, a court need only conclude any of the following: (1) all or part of the document was admissible, (2) it could have led to the discovery of admissible evidence, or (3) it would have been an effective tool in disciplining a witness during cross-examination, by refreshment of recollection or otherwise. *United States v. Gil*, 297 F.3d at 104. The court must consider the net effect of suppressed evidence, not simply its item-by-item effect. Cumulative materiality is the touchstone of *Brady* analysis. *Kyles v. Whitley*, 514 U.S. 419, 421, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ Suppression of exculpatory material violates due process irrespective of the good faith or bad faith of the prosecution. *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). However, if the defendant could have discovered the evidence, exercising due diligence, before or during the trial, then it will not be considered "suppressed" for *Brady* purposes.

The standard for granting a new trial for use of known false testimony is whether there is any reasonable likelihood that the known false testimony could have influenced the jury's deliberations. *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir.2001). The key is the adjective "reasonable." In order to obtain a new trial based on newly discovered evidence of trial perjury, the defendant must first demonstrate that the witness in fact committed perjury. *Id.*

■ When considering a new trial motion under Rule 33 of the Federal Rules of Criminal Procedure, the Court sits as a proverbial thirteenth juror, and may consider the evidence in whatever light seems most persuasive to it—which may or may not be most favorable to the Government. *United States v. Ferguson*, 246 F.3d 129, 139 (2d Cir.2001)(Walker, C.J., concurring in part and dissenting in part), and cases cited.[1]

### The Evidence Relating to the J & T Transaction

The contents of the FBI: Houston file relate primarily to the so-called "J & T transaction." Davidson was convicted of wire fraud in connection with that transaction for absconding with $250,000 that J & T had posted as a performance bond against completion of a transaction that, like all of Davidson's deals, was never consummated.

The evidence adduced at trial was as follows: An individual named Mordechai Templeman introduced Davidson to Alexander Joschko, a principal of J & T Financial Partners of Houston, Texas. The purpose of the introduction was to facilitate a

1. To the extent that the "thirteenth juror" analogy has been criticized recently by the Court of Appeals, it is in the context of cautioning district court judges not to go overboard with the idea, and to limit their assessment of evidentiary weight and witness credibility to "proper circumstances," giving due deference to the jury's findings. *United States v. Ferguson*, 246 F.3d at 139. However, in *Ferguson*, a district judge overturned a jury's verdict of conviction and granted a new trial based on her assuming a "thirteenth juror" role—and her decision was affirmed, albeit over the Chief Judge's cautionary dissent. Here, the jury and I reach the same conclusion.

transaction in eurobonds among J & T, Davidson (acting through a company identified as Investco), and Templeman. (Tr. 655–59).[2] The parameters of the deal were that J & T would obtain eurobonds from Gulf Atlantic Industries, which Davidson would then buy from J & T and resell on the market with a market markup. (Tr. 659).

Davidson and J & T entered into a written contract defining their mutual obligations. The contract (GX–1) was not signed until April 6, 1994, because the terms were the subject of extensive negotiation. (Tr. 663–4). The final contract required J & T to "enter into an acceptable contract with the Primary Provider" to purchase the eurobonds from one or more of the top 50 world banks; to "secure contractual agreements to discount or purchase" the bonds; and to use for that purpose an Investco account established with a "Major U.S. Securities Firm." Investco was to "secure the availability of funds to the amount of eighty-one (81) Million US–Dollars in their transaction account" (i.e., the account to be established at the major U.S. securities firm that J & T was to use to carry out the transaction), and instruct his bank to issue a conditional SWIFT in the amount of the invoice price. (GX 6–1, Section 2.0, Terms).

Among the terms on which Davidson insisted was the posting of a performance bond by J & T. He wanted J & T to post a letter of credit, but Joschko refused, because Davidson could have drawn down those funds immediately. So the parties discussed another type of security, one commonly used in Europe, known as a SWIFT wire with conditions. The condition of the SWIFT would be that if J & T defaulted in delivering at least one set of bonds during the contract window, or "other breaching of the Contract" (GX 6–1, Special Condition No. 1), defendant (or Investco) would be entitled to retain the funds as restitution for expenses Davidson would presumably incur in setting up a credit facility to make good on his obligation to come up with $79 million. (Tr. 665–66).

On March 31—a full week before any contract between Davidson and J & T was signed—J & T posted the $250,000 performance bond with Texas Commerce Bank. (GX 6–4, Tr. 667). Unfortunately, J & T's understanding of American banking practices was faulty, there being no such thing as a "conditional SWIFT wire" in American banking practice. The direction to the bank in the SWIFT wire (Ex. B to GX 6–1) was in fact unconditional (GX 6–4, Tr. 718), and on the very day the money was posted, Davidson moved the money out of TCB and into his own account at Atlantic Bank of Commerce. From there it was moved to the account of Interlotto, an English company owned in part by Davidson. (GX 10–19, Tr. 749, 1120–21, 1352–53, 1356–57). So days before J & T had formally undertaken any contractual obligation, Davidson already had moved the good faith performance bond outside the United States and into a bank account that he controlled.

The contract (GX 6–1, Sec. 2.5) required Davidson to instruct his Bank to provide a conditional SWIFT Funding Instrument, in the amount of the invoice price, to Gulf Atlantic's (the "Primary Provider's") correspondent bank, Barclays. As noted, the contract required Davidson to set up a transaction account with a major U.S. Securities firm. Joschko testified that, dur-

---

**2.** "Tr." refers to the trial transcript; "HTr." refers to the Rule 33 hearing transcript; "GX" and "DX" refer respectively to the Government's and defendant's exhibits at trial; and "HGX" and "HDX" refer respectively to the Government's and defendant's exhibits at the hearing.

ing their negotiations, Davidson identified the institution through which he would be working as Kidder Peabody. Davidson claimed to have a $25 million account with Kidder. (Tr. 665–66). On the defense case, Davidson called Ephraim B. Finkelstein, who at the time was a Kidder Peabody representative, to testify that Davidson had indeed spoken to him about whether Kidder would be interested in participating in the deal. (Tr. 1292 et seq.). According to Finkelstein, Kidder declined to participate because the deal appeared to be too good to be true—in other words, Finkelstein feared that it might not be legitimate. (Tr. 1299). Finkelstein also testified that, to the best of his knowledge, Davidson did not have an account with Kidder, did not have $25 million invested with Kidder, and did not have the ability to obtain a $79 million letter of credit with Kidder. (Tr. 1300–01).

As far as J & T knew, Kidder never notified Barclays of anything. (Tr. 679). Neither did any major U.S. financial institution, or for that matter *any* financial institution. (*Id.*, GX 6–7).

On April 9 or 10, a few days after signing the agreement, Davidson told Joschko that he had carried out his contractual obligation through a bank in Russia, and that he reserved the right to keep the performance bond if the eurobonds were not delivered. (Tr. 678). Joschko protested that the contract required Investco to work through a major U.S. securities firm, but Davidson insisted that he was free to use any bank in the world.

After attempting for several months to work out some accommodation with Davidson, J & T went to several federal agencies, including the Comptroller of the Currency (DX WW), the FBI, the IRS and the Secret Service (Tr. 692), trying to reverse TCB's transmission of the performance bond to Davidson.

Joschko was the principal trial witness proffered by the Government to testify about the J & T transaction. Defense counsel began his cross-examination of Joschko by asking, "Isn't it a fact, Mr. Joschko, that you and Mr. Tshacher and a Mr. Bruce were attempting to perpetrate a fraud on Irvin Davidson in connection with this transaction?" (Tr. 693). The cross examination focused on creating the impression that (1) Davidson was not the "scammer" but the "scammee," and (2) Joschko was a biased witness who attempted—without success—to use law enforcement to get his money back. Indeed, the defense argued to the jury in summation that Joschko and Tschacher attempted to scam Davidson, but that Davidson was too clever. (Tr. 1744, 1754–1764). Nonetheless, the jury convicted Davidson of wire fraud and money laundering in connection with this transaction.

### The FBI: Houston File

One of the agencies J & T approached to complain about the Davidson/TCB situation was the Federal Bureau of Investigation office in Houston, Texas. On January 26, 2004, a hearing was held concerning the Houston file and the effort by Special Agent Ann Paradiso of the IRS, who served as the case agent for this indictment, to obtain that file. The following constitute my findings of material fact.

#### Agent Paradiso's Request

Agent Ann Paradiso first became aware of the activities of Irvin Davidson in 1991, when she was approached by an IRS agent in Indianapolis, who was looking for information about the person known as "Mr. Big" in connection with an oil and gas scam. Shortly thereafter, Agent Paradiso went undercover and closed all her files, including the one on Davidson. When she returned from undercover duty in the 1993–94 time frame, Davidson's name came up in connection with another oil and

gas investigation, so she reopened his case. The investigation that began at that time led to the indictment in this case.

Paradiso first heard of what became known as the J & T transaction from a source in the FBI, who told her that he had been in contact with an office in North Carolina regarding that transaction. Paradiso then began her wild goose chase to find the North Carolina file. The agent in North Carolina said he had transferred it to FBI: New York City. New York City said it had been forwarded to Houston. Eventually, Paradiso obtained the name of a Houston FBI agent, Scharlene Fox, who supposedly had the file.

Paradiso contacted Fox in 1996. Fox, who worked in Houston's Financial Fraud Information group, told Paradiso that the case had been given to her to investigate as a possible bank fraud involving TCB. It originated on a complaint from someone named Tschacher. The complaint was taken by the complaint agent of the day and passed on to her. Fox told Paradiso that Houston did not have much interest in the case. She said it was not cost-effective for Houston to pursue because it involved only one transaction and its international aspects meant that it would be expensive to investigate.

Paradiso did want to pursue the matter, so she asked if she could have the file. Paradiso made two or three calls before the file arrived at her office in Smithtown, Long Island, in mid-April 1996. The file Paridisio received consisted of 29B–HO–40115 "serial" (FBI: Houston's synonym for "document") numbers 1, 4, 6, 7, and 18x1. Serial No. 1 was a standard FBI complaint form. Serial No. 4 was a fax of a letter received from Investco, together with an attached letter addressed to John Hitchcock of the CID division of IRS. Serial No. 6 was the write-up of an interview of Tschacher, which took place on August 1, 1994. Serial No. 7 was a fax from Tschacher to Agent Paradiso dated September 12, 1994. And Serial No. 18X1 was another fax from Tschacher. (GX 5, HTr. at 73). These few documents arrived in an envelope appropriate to the small size of the production. (HGX 1).

It is undisputed that all the documents sent to Agent Paradiso in HGX 1 were turned over to Davidson in discovery.

*The FBI: Houston Investigation*

Fox confirmed Paradiso's account of her office's lack of interest in the case. FBI: Houston was dealing with a huge backlog of bank frauds by working the oldest cases first. Also, the United States Attorney in Houston was only interested in looking at cases with a value of more than $1 million; the amount involved in the J & T transaction was only $250,000. So this new complaint did not fit into the office's priorities.

Nonetheless, a file was opened as an FBI: 29—a bank fraud (Fox's speciality). Tschacher's complaint to Fox, a bank fraud FBI agent, was that TCB had released money that had been wired to it conditionally without authorization. In speaking to the intake agent, he indicated that the party whose conduct was the subject of his complaint was Davidson—specifically that Davidson stole $250,000 in international securities from his company. (HDX 7 and its attachments). However, Fox was looking for evidence either that the bank (TCB) had defrauded the complainant (Klaus Tschacher of J & T), or that someone had defrauded the bank.

That Fox viewed the matter as a potential bank fraud is consistent with what she did and did not do in the course of her investigation: she interviewed the complainant (HDX 9) and she interviewed a representative of the bank. (HTr. 58). Fox also handled a number of communications from Tschacher who, consistent with J & T's efforts to try to get some federal agency involved in getting their $250,000

back, pestered her repeatedly about the progress of the investigation.

Fox did not interview Davidson. She sent a "lead" to FBI: New York to interview him, but did not press the matter when no interview took place. FBI: New York apparently did speak to Davidson's then lawyer, who provided them with a number of documents, which were sent on to Houston. Fox looked at them but saw nothing among them concerning the transaction she was investigating. She saw some documents in Spanish about Peru, but she testified that they were of no interest to her, and there is no credible evidence that she did anything except try to decipher them and then put them in her file.

Fox kept her file open for a full year, but obtained nothing that she thought evidenced a fraud either by or on the bank. Before closing the file, however, she ran the matter by agents in the wire fraud and bankruptcy fraud groups. They, too, were not interested in the case, although one of the agents gave Fox some materials about scams relating to prime bank instruments—the sort of instruments in which Davidson and J & T were ostensibly dealing—which he had obtained at a conference.

Fox's files contain evidence of communications between her and Tschacher in April 1995 (shortly before she closed the file) concerning the issue of prime bank instruments. (*See* HDX 10). In those communications, Tschacher provided Agent Fox with information from the International Chamber of Commerce describing European prime bank instruments. He also offered to disclose J & T's prime bank contacts "which you can check out through Interpol." There is no evidence that Agent Fox took Tschacher up on his offer.

On June 13, 1995, Fox recommended that the file be closed administratively. I

reproduce here her closing memorandum (DX 8) in its entirety:

Captioned case was opened based upon a complaint received from KLAUS TSCHACHER of J & T FINANCIAL PARTNERS, INC. (hereafter referred to as J & T). TSCHACHER alleges that IRWIN DAVIDSON defrauded him of $250,000 which was accidentally released by Texas Commerce Bank (TCB) to DAVIDSON for a security transaction in the amount of $79 million.

Investigation by writer has determined that TSCHACHER's partner, ALEXANDER JOSCHKO of Germany, and DAVIDSON dba INVESTCO LTD., entered into a joint-venture agreement to purchase medium term notes or bank debenture instruments. The agreement was drafted by JOSCHKO and signed by JOSCHKO and DAVIDSON. As part of the agreement a performance bond of $250,000 was to be place by J & T. TSCHACHER requested that TCB send a conditional SWIFT wire and TSCHACHER signed a funds transfer request form. A conditional SWIFT wire constitutes an advisory that funds are in place and is not an actual transfer of funds. TSCHACHER, a native of Germany, was not aware of the difference between the domestic Fed-wire used in the United States and the International SWIFT wire. Since TSCHACHER's funds were being wire [sic] to a bank in the United States, TCB wired $250,000 to SWISS BANK CORP., New York, New York, where the funds were released and deposited into the account of ATLANTIC BANK OF COMMERCE. From New York the funds were transferred to INVESTCO's account in Nassau, Bahamas. TCB and TSCHACHER requested that SWISS BANK CORP., ATLANTIC BANK OF COMMERCE and DAVID-

SON returned [sic] TSCHACHER's fund.

DENNIS LYNCH, IRWIN DAVIDSON'S attorney, advised that DAVIDSON felt that J & T failed to perform in the manner pursuant to an agreement and that no evidence of prime bank instruments were provided to DAVIDSON. J & T, according to LYNCH, was requested to provide proof of bank instruments and it failed to do so. Therefore TSCHACHER and JOSCHKO defaulted in their agreement with DAVIDSON's company. LYNCH advised that he felt that DAVIDSON is entitled to the $250,000 inasmuch as it is considered civil damages based upon J & T's breach of contract.

*TSCHACHER has not been able to provide any evidence to substantiate that he was criminally defrauded by DAVIDSON or TCB. Rather it appears that any wrongdoing is civil in nature.* (Emphasis added)

It is the writer's recommendation, therefore, that this case be closed administratively. Writer notes that there is no evidence placed in FBI Bulky Exhibit section.

Fox then closed her file. She forgot about the matter until some months later, when Ann Paradiso contacted her and asked that the file be sent to New York.

*Houston: We Have a Problem*

When Agent Fox received Agent Paradiso's request, she pulled her complete file, consisting of 464 pages of documents (HGX 6), out of the drawer (there having been no room for the evidence in the Bulky Exhibit section at ·FBI: Houston). HGX 6 is less than bulky by New York standards, but it is far fatter than the slim folio of documents that Agent Paradiso

received in response to her request. The main question for the hearing was how it could have happened that considerably less than Fox's entire file ended up in New York.

After talking to Agent Paradiso and pulling out her file, Agent Fox did three things. She addressed HGX 1 to Agent Paradiso. She prepared a draft version of the first page of HGX 6, a Form FD–159 (Record of Information Furnished to Other Agencies), noting in pencil all entries seen on that form *except the list of what "Serial Numbers" were actually being provided to Agent Paradiso.*[3] Finally, she gave the entire file, together with her draft cover memo, to the Legal Department at FBI: Houston.

Fox never saw her file again. The paper record reveals that it was reviewed by ADC Victor Hartmann, who apparently selected the few documents that he believed were responsive to Paradiso's request (Serial Nos. 1, 4, 6, 7 and 18x1) and sent them to her in Smithtown, New York.

It is clear that Hartmann did not send Paradiso the entire file, because the final, typed version of Form 157, "Documents Disclosed to Other Agencies," lists only the serials that were in fact sent to New York. The list of documents sent to Paradiso corresponds exactly to the slim file she turned over to the Assistant United States Attorney, who turned it over to Davidson's lawyer. Hartmann never spoke to Paradiso, so he had no idea what she was looking into or what might have been useful to her investigation. How he selected the documents he chose to send her remains a mystery.

Paradiso testified, credibly, that she had no idea that she was not receiving the

---

**3.** Put otherwise, Agent Fox handwrote in the date, the subject of the request (Irwin Davidson, DBA Investco, Ltd.) and Agent Paradiso's address. The rest of the information was inserted by someone else at FBI: Houston, who typed the FD–159 in its final form.

entire FBI: Houston file in response to her request.

In view of the foregoing, I find that the entire FBI: Houston file was NOT transmitted to IRS New York in April 1996, as defendant alleges, and Agent Paradiso never saw the full contents of that file until Davidson's FOIA request turned up the long-lost original in 2002, well after the trial and appeal. Therefore, neither Agent Paradiso, nor Assistant United States Attorneys Jonas and Guss, nor anyone working on the case that was eventually indicted in the Southern District of New York had actual knowledge of the complete contents of Agent Fox's file.

Because Davidson and his counsel, Stuart Abrams, insisted repeatedly that there had to be more documents in the Houston FBI file than those turned over by the Government during pre-trial proceedings in this case, the Assistant United States Attorneys trying the case made additional inquiries. They were told that the entire FBI: Houston file had been destroyed during routine file maintenance. HGX 3, a Form FD–160 (Indices Search Slip) appears to indicate that the file was destroyed in March 1996. Of course, that is impossible, since some documents from the file were sent to Agent Paradiso on April 19, 1996. However, the Assistant United States Attorneys were clearly led to believe that the file no longer existed, and they so represented to Mr. Abrams and to the Court. I have no reason to conclude that this representation was made in bad faith.

*Old Files Never Die: The Miracle of FOIA*

Agent Fox's file was not destroyed, either before or after March 1996. Instead, it sat in some federal document limbo while Davidson—now incarcerated and having nothing better to do—tried to locate it.

The file finally surfaced March 22, 2002, in response to a Freedom of Information Act request Davidson propounded to the FBI. (Exhibit A to Deft's Motion). After defendant and his lawyers examined the file, Davidson made this motion.

***The Contents of the FBI: Houston File***

The key documents from Agent Fox's file, as identified by the defense, are described below, together with the defense's rationale for why their non-production violated *Brady*.

1. Agent Fox's closing memo (Ex. D to Defendant's Motion for a New Trial), which is quoted above in its entirety. The defense insists that Fox's conclusion that the matter should be handled civilly, not criminally, is exculpatory, and could have been introduced by the defense during the trial. Alternatively, even if the hearsay memorandum were not itself admissible, the defense argues that, if Abrams had access to the memo, he could have called Agent Fox to the stand, to testify either to her conclusion or to the allegedly nonconclusory "fact" that the J & T complainants had not produced evidence to substantiate that he was criminally defrauded by Davidson.

2. Four faxed pages, purporting to be the copy of a four-page SWIFT wire that was ostensibly sent from the Russian bank to Barclays, and that Davidson sent to Joschko as proof of performance. (Ex. I to Defendant's Motion for a New Trial, introduced at hearing as HGX 2). At trial, Joschko testified that he received an "illegible" fax of a SWIFT wire from Davidson, which supposedly confirmed that this Russian bank had notified Barclays about his capacity to perform. (Tr. 678). He also testified that the copy he was sent did not contain a first page showing to whom, if anyone, it had been sent, as required by the contract. (Tr. 671; GX 6–1, Ex. B). Joschko testified that he did not "retain" a

copy of the document Davidson sent him, but said that it looked "similar to" GX 3–27 (which is not a fax of the SWIFT wire, but is a blurry and difficult-to-read faxed document of some sort).

Defendant was shown a document on cross examination, DX TT, which is (supposedly [4]) a legible copy of a five page document—a cover page (GX 6–2) and the four page SWIFT wire (HGX 2). Joschko testified that he had never seen the first page of DX TT (which in fact is not part of the SWIFT wire in the FBI: Houston file), but then backtracked to say that he had "never received this document"—a somewhat ambiguous statement that neither side bothered to clear up. The remaining pages of the SWIFT wire contained in the file at FBI: Houston were clearly received by Joshcko, because the file copy has a fax legend on top indicating that, on May 14, 1994, Joschko faxed the document to someone else.

Contrary to Joschko's testimony, the copy of the SWIFT wire in the FBI: Houston file, while blurry and hard to read in places, can be made out in substantial part (and is far more legible than, say, GX 3–27). A line that is clearly visible on each of the four pages clearly says "TO" and "BARCGB22XXX Barclays Bank PLC (All U.K. Offices) LONDON."

The defense contends that the document was exculpatory, both because it could have been used to undercut Joshcko's credibility on cross-examination and because it demonstrated Davidson's performance of his contractual obligations to J & T—i.e., his notification of Barclays of his ability to perform, per the terms of GX 6–1, his contract with J & T. The defense also claims that Joschko's receipt of a legible SWIFT wire undermines the prosecution's argument that the J & T transaction was similar to another of Davidson's frauds, the London & Wessex fraud, in which he was also accused of sending an illegible fax.

3. A copy of a self-serving letter that Davidson sent to the IRS and thereafter faxed to FBI: Houston during the course of the 1994–95 investigation. (Ex. L to the Defendant's Motion for a New Trial). The defense had Davidson's file copy of this letter during the trial and in fact attempted to introduce it. The Government refused to stipulate to the authenticity of the letter, claiming that it had no record of receiving it. Defense now contends that I would have admitted the letter if I had known that the FBI: Houston file contained proof that the letter was received. In fact, I declined to let it in, concluding that defendant was trying to contradict Joschko's testimony about the transaction without subjecting himself to cross-examination. (Tr. 1369–71).

4. The Form 71 (Complaint) prepared by the intake agent at FBI: Houston, to which were appended letters sent by J & T to the Secret Service concerning its loss of funds to Davidson. This letter (Ex. M to Defendant's Motion for a New Trial) describes TCB as having "accidentally released" the $250,000 that J & T thought it had wired to TCB on a conditional basis"—a description the defense deems inconsistent with any fraud on Davidson's part, even though the sentence in which the words "accidentally released" appears begins with the phrase, "We have been *defrauded* by Irvin Davidson . . . ." (Id.). (Emphasis added)

5. Documents concerning the so-called "prime bank scam." Davidson argued vigorously during the trial that it was J & T

---

4. Unfortunately, no one seems to be able to find a copy of DX TT, which was marked for identification by Davidson but was not introduced into evidence at trial. The character-ization of the document in the text of this opinion does not, however, appear to be disputed.

who were trying to pull off a fraud—on him—by pretending to have access to prime bank instruments when in fact they did not. The FBI: Houston file contained documents about prime bank scams, together with a memo from Tschacher showing that there had been some inquiry directed to him on that subject. In response to that inquiry (HDX 10), Tschacher offered to reveal J & T's prime bank contacts to FBI: Houston, so that they could be checked out through Interpol. This statement by Tschacher allegedly contradicts Joschko's testimony that he had no knowledge about either the bonds' existence or the fact that they were being provided to J & T by an intermediary. The file also contained a report from the International Chamber of Commerce Crime Bureau (which, after the hearing, I conclude was given to Agent Fox by the Frauds Bureau of FBI: Houston) that contains information about prime bank scams. Certain J & T promotional materials (also contained in Fox's file) are similar in many ways to the sort of materials the ICC warns about. With this information, defendant argues, he could not only have further impugned Joschko's testimony that he did not know about prime bank scams, but also proved that Davidson was the victim of a fraud, not the perpetrator of one.

6. Documents stating that Barclays' Bank was to "issue" the eurobonds (Ex. R to Defendant's Motion for a New Trial) or that the paper securities were "from" Barclays' Bank in London (Ex. S). These documents purportedly justify Davidson's skepticism about Barclays' role in the deal and rationalizes his request for written confirmation from Barclays before he would go forward. (GX 6–6). J & T's refusal to respond to Davidson's request supposedly supports the defendant's contention that J & T breached the contract, thus justifying his taking custody of the $250,000.

7. A handwritten memo dated June 20, 1994, entitled "Potential Littigation [sic] Scenario," which discusses how J & T would use information developed during any governmental investigation as the basis for a multi-million dollar lawsuit against Davidson and TCB. (Ex. R to Defendant's Motion for a New Trial). Defendant claims this document would have been useful on cross examination to show Joschko's bias and motive to testify falsely.

### The Grounds for Defendant's Motion

Davidson propounds two reasons why he should be granted a new trial on all charges.

First, he asserts that Agent Paradiso had the entire FBI: Houston file in her actual possession; that she was aware of the contents of the file; that Assistant United States Attorneys Jonas and Guss were either actually or constructively aware of the file's contents; that the Government put on Joschko with full knowledge that his testimony was perjurious in a number of respects. If true, this would require vacatur of Davidson's conviction under the stringent standard.

In the alternative, the defense argues that, for the reasons outlined above, the cumulative effect of the withheld evidence is such that the wire fraud and money laundering convictions relating to the J & T transaction must be vacated and a new trial ordered on those counts. The defense also argues that, because the J & T transaction was the so-called "lynchpin" of the Government's fraud case, a new trial is required on all the remaining counts—or at the very least on all counts except the three counts of tax evasion.

## CONCLUSIONS

### 1. The Government Did Not Knowingly Introduce Perjured Testimony From Joschko

My findings of fact, as set forth above, admit of but one conclusion—the Govern-

ment's failure to procure and turn over the FBI: Houston file was inadvertent, not willful. The Government lawyers and agent who investigated and prosecuted Davidson made all reasonable efforts to locate and obtain the FBI: Houston file and to do so in a timely manner. Agent Paradiso asked the right person—Agent Fox—to send her the file. She asked for the entire file, not part of the file. She did not receive the entire file because her request was mishandled (to say the least) at FBI: Houston. Neither Agent Paradiso nor the prosecutors knew that they did not have the entire file and they were not familiar with the contents of the documents that were not sent. Therefore, whether or not Joschko perjured himself (and as I will discuss below, it is not at all clear that he did), the prosecutors were not complicit in any misconduct on his part.[5] There is, therefore, no basis upon which I could set aside the verdict due to the Government's alleged *knowing* use of perjured testimony.

**2. Neither Agent Fox's Closing Memorandum Nor Testimony Concerning Her Conclusions Is Exculpatory Evidence for Brady Purposes, so the Government did not Violate Brady by Failing to Turn the Memo Over**

■ Agent Fox's closing memorandum, with its statement that Joschko and Tschacher failed to turn over evidence to substantiate their complaint of criminal fraud, is described by the defense as a devastating piece of exculpatory evidence. However, the Government is correct that neither the memo nor any testimony that might be derived from its contents is properly characterized as exculpatory evidence for *Brady* purposes.

**5.** I believe the defendant's counsel more or less conceded this after listening to the testi-

To reiterate: evidence is material for *Brady* purposes if any one of the following three criteria is met: (1) all or part of the document is admissible; (2) it could lead to the discovery of admissible evidence, or (3) it would be an effective tool in disciplining a witness during cross-examination, by refreshment of recollection or otherwise. Agent Fox's closing memorandum does not satisfy any of these criteria.

*A. The Closing Memo is Not Admissible*

■ Defendant argues that the memorandum itself could have been introduced into evidence because it was not hearsay, but rather a prior inconsistent statement by the Government. Fed.R.Evid. 801(d)(2). Unfortunately, the case on which defendant relies for that proposition, *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir.1991), compels the opposite conclusion.

The alleged "inconsistent statement" in this case is *the indictment*, which accuses Davidson of committing substantive crimes—wire fraud and money laundering—in connection with the J & T transaction. Agent Fox opined that, based on the evidence submitted to her, "any wrongdoing was civil in nature." If the indictment were a statement of the Government, then *GAF* might well compel the introduction of Fox's memo as a prior inconsistent statement—although one could certainly argue that the opinions of Agent Fox, who did no work on the tax case that resulted in the instant indictment, did not constitute a statement by "The Government" as that term is used in *GAF*. (In *GAF*, the two different bills of particulars that constituted inconsistent statements were prepared by the same U.S. Attorney's Office).

mony at the hearing.

However, the *GAF* Court, quoting no less an authority than Learned Hand, noted that an indictment is a statement by the grand jury. And the grand jury *is not the Government*—it is an arm of the Court. *GAF Corp.*, 928 F.2d at 1261. Thus, there is no identity of parties between FBI: Houston and the grand jury, which would be needed to make Agent Fox's conclusion a prior inconsistent statement by the Government.

Defendant also argues that Agent Fox's memorandum was admissible under Fed. R.Evid. 803(8)(C), which permits the introduction of "factual findings resulting from an investigation made pursuant to authority granted by law" against the Government in a criminal case. Neither side's brief discusses this exception to the hearsay rule in any detail. This is no doubt because the Agent's "finding" is not a "factual finding" in the sense contemplated by either Congress when it passed the Rule or the United States Supreme Court when it decided *Beech Aircraft v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). Agent Fox made no finding of fact one way or the other. She did not find that there was any wrongdoing by any party, and she did not conclude that there was no wrongdoing by any party. She did not even decide, as between two competing versions of events, which one was correct and which was not. She simply set out each side of the story and recited the *legal* conclusion that—based on the evidence before her—whatever happened was not criminal in nature.

Since the Supreme Court's decision in *Beech Aircraft*, it has been beyond cavil that evaluative reports resulting from Government investigations—even reports containing conclusory opinions by the investigators—are admissible in evidence under Fed. R. Evid. 803(8)(C). In *Beech Aircraft*, the spouses of two naval pilots killed in an airplane crash brought a product liability suit against Beech Aircraft Corporation. At trial, the defense attempted to admit into evidence excerpts from an investigative report prepared by the Judge Advocate General (JAG), which concluded that the accident had not been caused by faulty machinery. The Supreme Court held that the trial court properly admitted the report under Fed.R.Evid. 803(8)(C):

> [E]valuative reports are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." This trustworthiness inquiry—and not an arbitrary distinction between "fact" and "opinion"—was the Committee's primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements of the report. Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof—whether narrow "factual" statements or broader "conclusions"—that she determines to be untrustworthy. Moreover, safeguards built in to other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them.

*Beech Aircraft v. Rainey*, 488 U.S. at 167–168, 109 S.Ct. 439 (footnote omitted).

The Supreme Court set forth a number of factors entering into a trustworthiness determination: "(1) the timeliness of the investigation; (2) the investigators's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." In *Beech Aircraft*, the Supreme Court adopted the unrefuted finding of the district court that the crash investigation report was trustworthy, a requirement of Fed. R. Evid 803(8)(C). Noting that no

party had challenged the trustworthiness of the JAG report in *Beech Aircraft,* the Supreme Court said, "We have no occasion to express an opinion on it." *Beech Aircraft v. Rainey,* 488 U.S. at 168 n. 11, 109 S.Ct. 439.

*Significantly, the Court did not rule that all Government reports were trustworthy or hold that every report emanating from a government investigation would or should be admitted into evidence.* The *Beech* court observed that a different trial court had declined to admit a similar JAG report in another air crash case, because the report "was prepared by an inexperienced investigator in a highly complex field of investigation." *Beech Aircraft v. Rainey,* 488 U.S. at 168 n. 11, 109 S.Ct. 439, *citing Fraley v. Rockwell Int'l Corp.,* 470 F.Supp. 1264, 1267 (S.D.Ohio 1979).

I did not have the closing memorandum before me at the trial, and so had no opportunity to pass on its reliability—and hence its admissibility—at that time. However, I have it before me now, and I have held the hearing contemplated by *Beech Aircraft.* After reviewing the file and listening to the testimony of Agent Fox, I can say with great confidence that I would not have admitted the report, for two reasons.

First, as noted above, the memo contains absolutely no finding of fact—only a legal conclusion (no crime/any wrongdoing civil in nature) following a recitation of "J & T said/Davidson's lawyer said." Agent Fox did not even determine which party's story was more likely the true story. She reached no conclusion about what actually happened—unlike the investigator in Beech Aircraft, who determined, after examining various possibilities, that pilot error was the cause of an air disaster. All she really concluded was that she lacked enough evidence to charge anyone with a crime. Such a "conclusion" hardly qualifies as a *"factual finding* [ ] resulting from

an investigation made pursuant to authority granted by law." *See* Fed.R.Evid. 803(8)(C) (emphasis added).

Moreover, in the criminal context the trustworthiness of conclusions sought to be admitted pursuant to Fed.R.Evid. 803(8)(C) is of particular importance, and the conclusion in the penultimate paragraph of Agent Fox's closing memorandum simply does not rise to the level of "trustworthy." I am constrained to agree with the Government that the "investigation" that gave rise to Agent Fox's statement was (to be polite) cursory. Agent Fox stated that she devoted perhaps one percent of her time looking into Joshko's allegations. (HTr. 80). She admitted that the J & T file was "put on the back burner," because her office was inundated with old cases involving bank failures. (HTr. 81). And notwithstanding J & T's desire to pillory Davidson, I find credible Fox's assertion that her sole focus, as a member of the FBI Financial Frauds team in Houston, was on whether TCB (a bank) had either participated in a fraud or been defrauded. (HTr. 62, 73).

Given the limitations on her investigation, Agent Fox's conclusion certainly cannot be read to suggest that Davidson was not guilty of wire fraud or money laundering (the crimes with which he was eventually charged). Indeed, there is absolutely no indication in HGX 6 that Fox looked into either wire fraud or money laundering, and her desultory effort to interest agents more skilled in those areas in the file was unavailing. Unlike IRS Agent Paridiso, who conducted a thorough investigation of the J & T transaction and others like it, Agent Fox conducted an extremely limited inquiry into Tschacher's complaints. (HTr. at 73). Moreover, Agent Fox demonstrated no particular level of skill in doing even that much, and considerable laxity in following up on leads

that might have alerted her that more was going on.

Neither is Agent Fox's closing memorandum admissible because the Government "opened the door" in arguing that J & T went to the Government to complain promptly. Whether or not J & T made a "prompt outcry" after the $250,000 disappeared is completely irrelevant to Agent Fox's ultimate conclusion that the investigation should be closed, because Tschacher had not given her evidence of wrongdoing that was anything other than civil in nature.

*B. The Closing Memorandum Does Not Lead to Admissible Evidence*

Nor could Agent Fox's closing memorandum lead to the discovery of admissible evidence. Defendant argues that even if the memo itself was inadmissible, a skilled lawyer like Mr. Abrams, knowing its contents, might have called Agent Fox to the stand.

But even if Agent Fox had been called as a witness, she could not have testified about her conclusion that "TSCHACHER has not been able to provide any evidence to substantiate that he was criminally defrauded by DAVIDSON or TCB. Rather it appears that any wrongdoing is civil in nature."

Whether Davidson defrauded J & T was the ultimate question for the jury on the J & T wire fraud count (Counts 2). Moreover, since wire fraud was the specified unlawful activity on the J & T money laundering count (Count 10), it was the ultimate question for the jury there as well. Although Fed.R.Evid. 704 allows both expert and lay witnesses to give opinions on ultimate issues, testimony that expresses such a conclusion with legal terminology is ordinarily not admissible. *United States v. Scop*, 846 F.2d 135, 140, *modified in part on other grounds*, 856 F.2d 5 (2d Cir.1988).

In *Scop* defendant was on trial for mail fraud and security fraud in connection with the initial offering and subsequent trading of the stock of an automobile dealership. The Government called Stanley Whitten, the chief investigator for the SEC—who worked on developing the case against the defendants—as an expert witness in securities trading practices, pursuant to Fed. R. Evid. 703. *Id.* at 138. Whitten testified that in his opinion "the stock of European Auto Classics was *manipulated* and that certain individuals were active participants and *material participants* in the manipulation of that stock... [a]nd that these individuals engaged in a *manipulative and fraudulent scheme* in furtherance of that manipulation." *Id.* (Emphasis added). The Second Circuit held that Whitten's opinion testimony exceeded the permissible bounds of expert testimony:

> Had Whitten merely testified that controlled buying and selling of the kind alleged here can create artificial price levels to lure outside investors, no sustainable objection could have been made. Instead, however, Whitten made no attempt to couch the opinion testimony at issue in even conclusory factual statements but drew directly upon the language of the statute and accompanying regulations concerning "manipulation" and "fraud." In essence, *his opinions were legal conclusions* that were highly prejudicial and went well beyond his province as an expert in securities trading.

*Id.* at 140.

Although the *Scop* court was dealing with the rule of evidence relating to expert testimony, it cited from the Advisory Committee Notes to Fed. R. Evid. 704, "Opinion on Ultimate Issue;" those same notes are instructive here:

> The abolition of the ultimate issue rule does not lower the bar so as to admit all opinions. Under Rules 701 and 702,

opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

McCormick § 12 at 50–51, n. 22. *See also United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir.1991) (expert testimony explaining how term is generally understood in the securities industry properly excluded); *Federal Aviation Administration v. Landy*, 705 F.2d 624, 632 (2d Cir.1983) (questions soliciting former FAA employee's understanding of the meaning and applicability of administrative regulations would invade the province of the court); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510–11 (2d Cir.1977) (holding that an expert's legal opinion on the meaning of certain contract terms was, inter alia, an invasion of the court's authority to instruct the jury on the applicable law); *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir.1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.")

Here, the penultimate paragraph of Agent Fox's closing memorandum contains exactly the type of legal conclusion, couched in legal language (no evidence of a crime/wrongdoing was civil in nature) that the Second Circuit found to be outside the scope of Rule 703 and the Advisory Committee believed was not encompassed by Rule 704. Whether there was enough evidence for a jury to conclude beyond a reasonable doubt that Tschacher was **"criminally defrauded"** by Davidson was a determination for the jury to make, on the basis of (1) the evidence admitted at the trial (which, I must note, was considerably more than the evidence available to Agent Fox[6]) and (2) the Court's charge on wire fraud and money laundering. Agent Fox's opinion that Davidson committed no crime, based on a more limited evidentiary record than the one before the jury and without the benefit of my charge, could have been of no help to the jury. Indeed, such testimony, which amounted to no more than an FBI agent's saying, "The defendant is not guilty," could only have confused the jurors on the ultimate issues they were charged with deciding—did the defendant commit wire fraud in connection with the J & T transaction, and if so, did he launder the ill-gotten proceeds.

*C. The Closing Memorandum Was of No Use in Cross-Examining Other Witnesses Who Were Called to Testify at the Trial.*

Finally, the memorandum could not have been used to discipline witnesses during cross-examination. The author of the memorandum was not called by the Government, and Fox's recitation of the facts and conclusions would have been of no value in cross-examining Joschko, who was not privy to them. So even as skilled a lawyer as Mr. Abrams could not have

---

**6.** I do not mean by this the evidence of other crimes committed in a similar manner, although of course such evidence was adduced at trial. I mean evidence peculiar to the J & T transaction, including especially evidence about what happened to the money posted by J & T with TCB even before the parties had signed their contract.

made use of Agent Fox's memo in the *Brady* sense of "making use."

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001), which defendant mentioned at the hearing (but did not discuss in his brief), is not to the contrary. In that habeas case, the Court of Appeals concluded that the People had failed to disclose in a timely manner the material eyewitness testimony of a police officer (a "trained observer"), which contradicted the eyewitness testimony of other witnesses in important respects. There was no question of the non-disclosed testimony's being opinion testimony or conclusory; the police officer in question was standing in an apartment window above the crime scene and observed some of the events in question. He had exculpatory factual evidence to give and the defense was not aware of that evidence prior to trial. The *Brady* violation could not be clearer.

I thus conclude that the Government's failure to turn over Agent Fox's closing memorandum did not violate *Brady*. Therefore, in considering whether the FBI: Houston file contained information that, taken as a whole, would have impacted the fairness of defendant's trial, I do not consider Agent Fox's closing memorandum. I consider only the rest of the file's contents.

### 3. Even Without the Closing Memorandum, The FBI: Houston File Contained Some Brady Material.

While Agent Fox's closing memorandum is not *Brady* material, there was other *Brady* material in the files at FBI: Houston—material that, while not as exculpatory as defendant argues, would nonetheless have been extremely useful to a skilled cross-examiner like Mr. Abrams.

### A. The SWIFT was Brady Material

I start with the SWIFT itself. The Government argued forcefully that part of Davidson's misconduct in connection with the J & T transaction was sending Joshcko an illegible SWIFT as proof that he had complied with his contractual obligations. Joschko himself testified that the SWIFT that he received was largely illegible, that he could make out "almost nothing" on the document. (Tr. 711).

The SWIFT document that J & T provided to Agent Fox, which has now been found in the FBI: Houston file, is legible enough to give the lie to both that testimony and the Government's argument based thereon. The SWIFT, bearing Joschko's name and fax number at the top, could also have been used to discredit his testimony that he had never seen (DX TT) before (assuming that what Joshcko meant by his testimony was that he had never seen the entire document, rather than he had never seen the top page). It is, therefore, a document that would have been useful to Mr. Abrams in the cross examination of the key Government witness on this transaction. I am not persuaded that the jury could infer from this document that Davidson satisfied his contractual obligations—far from it—but that does not remove the document from the ambit of *Brady*.[7]

---

**7.** Defendant's moving brief makes a footnote reference to the Government's mid-trial disclosure of clean (i.e., legible) copies of certain faxes from London & Wessex, and notes that the Government argued on summation that the J & T SWIFT fax was "one of those illegible faxes, the same thing that he sent to London & Wessex." Defendant refers to this as an independent *Brady* violation (i.e., not one involving the FBI: Houston file), because clean copies were not disclosed in time to be used at trial. Since defendant does not clearly articulate his argument it is difficult to respond, but it does not appear to be correct. The Government disclosed the document at a time when the defense, having heard the testimony about an illegible fax sent to London & Wessex, could have introduced the legible copies of the fax into evidence to rebut the

The fact that defendant had a legible copy of the SWIFT in his files (DX TT) and used it in cross-examining Joschko does not alter this conclusion. As Davidson notes, the newly discovered evidence here is the supposedly illegible copy of the SWIFT that was received and possessed by J & T—the very fax that was described by Joschko to the jury. It is the legibility of the document that makes it *Brady* material, not the contents of the document.

### B. Proof of FBI: Houston's Receipt of Davidson's Self–Serving Letter is *Not* Brady *Material*

The FBI: Houston file also contains proof that the Government received Davidson's self-serving letter, which was kept out of evidence at the trial. Whether that qualifies as a *Brady* violation depends on the admissibility of the letter. Davidson contends that I would most likely have admitted the letter if I had known that it was received by FBI: Houston. He is incorrect.

██ The self-serving letter was hearsay. It was offered in an attempt to get Davidson's side of the J & T story in front of the jury without him testifying and opening him up to cross-examination. That was the reason I excluded it from evidence—not because the letter was not authenticated or receipt by the Government not proved. (*See* Tr. 1369–70). It falls within no hearsay exception known to this Court, including Fed. R. Evid. 803(3) (state of mind). I would never have admitted it, even if I had been presented with a return receipt signed by an agent of the FBI attesting to its delivery.

Defendant's reliance on cases like *United States v. DiMaria*, 727 F.2d 265 (2d Cir.1984), *United States v. Harris*, 733 F.2d 994 (2d Cir.1984) and *United States v. Lawal*, 736 F.2d 5 (2d Cir.1984) is misplaced. The state of mind exception focuses on the contemporaneity of the statements with the allegedly criminal acts and the unlikelihood of deliberate or conscious misrepresentation. *United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir.1991). In each of the cases cited by Davidson, the defendant sought to introduce oral statements *made contemporaneously with the commission of the alleged crime*. Here the crime was committed on or about March 25, 1994, when Davidson caused the money that had been wired to TCB to go from that bank to his own personal account at Atlantic Bank of Commerce, from whence it was transferred to Interlotto. Those events were months in the past when Davidson wrote the letter he sought to introduced at trial. That letter—which is no more than Davidson's version of what took place months earlier—is not reliable evidence of Davidson's state of mind at the time when the allegedly criminal acts were taking place. Moreover, because the letter so far post-dates the events that were the subject of the indictment, there was ample time for fabrication, which renders the "state of mind" exception inapplicable.

To the argument that the very sending of the letter proves Davidson's innocent state of mind—because why would a man

Government's suggestion that Davidson engaged in a pattern of sending such faxes. (Ex. J to Defendant's Motion for a New Trial). The cases cited by defendant concerning belated disclosure of *Brady* material, see *Leka v. Portuondo*, 257 F.3d 89, 100–03 (2d Cir.2001) and *United States v. Coppa*, 267 F.3d 132, 142, 144 and N. 9 (2d Cir.2001), do not stand for the proposition that all mid-trial disclosure of exculpatory material violates *Brady*—only mid-trial disclosure that requires further investigation, which the defense team has no time to undertake. In order to take advantage of the legibility of the London & Wessex faxes, all defense counsel had to do was look at the newly-disclosed documents, see that they were legible, introduce them in evidence, and make his argument to the jury.

guilty of fraud have congress with the FBI and the IRS?—the response is (1) the argument is logically fallacious, and (2) defense could readily have established the fact of his cooperation with the investigation without divulging to the jury the contents of a hearsay letter. He did not even have to testify. All Davidson had to do was call his former lawyer to the stand. Mr. Lynch could have testified to the actions he took on behalf of his client to provide information to Agent Fox. Defendant could also have ascertained Agent Fox's identity (again, via Mr. Lynch) and called her to testify that Davidson sent her a letter. All this could have been accomplished without Government disclosure of the FBI: Houston file.

### C. The Peruvian Rice Documents are Not Brady Material

The next category of documents to consider are the Peruvian Rice documents. Davidson does not allege that the contents of these documents are exculpatory; rather, the "exculpatory" value of these documents depends entirely on defendant's contention that Agent Fox looked into the Peruvian Rice deal and concluded that no action was warranted.

I cannot agree, for two reasons.

First, since Agent Fox's closing memorandum and/or testimony about her conclusion is not exculpatory within the meaning of Brady, I cannot see how these additional documents—which are not exculpatory on their face, and which have not been shown to be of value in cross examining any trial witnesses—could possibly be exculpatory.

Second, perusal of Agent Fox's closing memorandum (Ex. D to Defendant's Motion for a New Trial) makes no mention whatever of the Peruvian Rice transaction. So the conclusion that defendant would have me reach—that FBI: Houston must have looked into both transactions and con-

cluded that neither was criminal in nature—simply does not follow as a matter of logic. The presence of a telephone directory in an FBI file is not, without more, evidence that everyone in the directory was called during the course of the investigation. So the presence of these documents in Agent Fox's file is not evidence that Agent Fox conducted any investigation into the Peruvian Rice matter or reached any conclusion one way or another about its legality. And in fact, she testified—credibly—that she did not do so. (HTr. 61).

### D. The ICC Prime Bank Documents Are Not Brady Material

The next category of documents found in the FBI: Houston file are the documents Agent Fox received from a fellow agent describing prime bank instrument scams, and the memo from Tschacher that on its face appears to be a response to an inquiry from Agent Fox about this matter. Defendant argues that this material suggests that his defense—which was that J & T was trying to scam HIM, not vice versa—was viable.

The documents relating to prime bank scams consist of materials prepared by the International Chamber of Commerce. They describe the scam generally, but do not name any entity as a perpetrator of the scam. Contrary to defendant's argument (Reply Mem. at 37), nothing in the FBI file suggests that the FBI reach any "conclusion that J & T attempted to perpetrate a fraud." (Id.) (emphasis added). The mere fact that these documents were in the FBI: Houston file proves nothing one way or the other about J & T's bona fides. Thus, these documents, without more, do not inculpate J & T..

Moreover, assuming arguendo that the ICC documents were somehow inculpatory of J & T, that does not mean they exculpate defendant. Davidson argues this

point as though bad actions on the part of J & T automatically make him an innocent victim. But as the Government points out, it makes no legal difference if the parties on both sides of this transaction were trying to scam each other. The ICC documents say nothing whatever about Davidson's conduct, so they do not exculpate Davidson.

In any event, the ICC Special Report on Prime Bank Instrument Frauds could not be introduced into evidence in order to affirmatively prove that J & T was engaged in a prime bank scam. Defendant suggests no rationale under which this hearsay document could be admitted. The International Chamber of Commerce is, as far as this Court knows, a private non-governmental organization. It is therefore unlikely that the Report qualifies as "factual findings resulting from an investigation made pursuant to authority granted by law," which would get it in under the hearsay exception in Fed.R.Evid. 803(8)(C). Nor does defendant clarify what he would have been able to do with the information in the Report (had he been unable to introduce the Report) to better develop his claim that J & T was trying to defraud Investco. For example, Davidson draws attention to certain portions of the Report (assembled as part of Ex. Q to Defendant's Motion for a New Trial) that recommend following his strategy of insisting on a tested telex from the Issuing Bank (Barclays, in the context of the J & T deal). But Davidson could not simply have introduced this portion of the Report and then argued that he demanded a tested telex by sending GX 6–6 (a document created *over two months after Davidson transferred the performance bond into his account*) because he was afraid of being scammed. Davidson would have had to get on the stand and testify about what he did and why he did it before he could have asked the jury to draw such an inference. He could have testified about his actions

and motivations without knowing that FBI: Houston had a copy of the ICC Report in its file.

Finally, assuming arguendo that the document could have been admitted into evidence, there is no indication in this record before me that defendant could not have obtained the ICC Report on his own. Davidson argues that the contents of the documents in the FBI's files were "secret," but nothing on the face of the ICC Report suggests that it could not have been obtained from the institution that published it. Knowing that his defense to the J & T transaction was that he was the victim, not the perpetrator, defendant could have searched relevant data bases, found out about the report, and either introduced it or used it to cross-examine Joschko. In the absence of some showing by defendant that the Report was not available outside the law enforcement community (and the text of the Report strongly suggests that it was written for the investment community), it does not qualify as "newly discovered evidence," even though the copy in Agent Fox's file was not turned over. The same is true of the ICC Commercial Crime Bureau Press Release (which is by definition not a secret document) dated February 22, 1993. (Ex. Q to Defendant's Motion for a New Trial).

### E. The April 13, 1995 Memo is Brady Material

The April 13, 1995 memo from Tschacher to Agent Fox, which appears on its face to be some sort of response to an inquiry about prime bank instruments, presents a different and closer question. Davidson's defense was, in essence, that because he suspected J & T was out to scam him, he demanded the performance bond. Although we do not know exactly what Agent Fox asked Tschacher about prime bank instruments, she clearly asked him some-

thing. The fact that an FBI agent asks a question, without more, is neither inculpatory of J & T nor exculpatory of Davidson. But it is an interesting fact, one that a lawyer who was planning to intimate that J & T was the con artist here would have liked to know.

In response to Agent Fox's inquiry (the nature of which is not known, since there is no memo explaining her inquiry in the file), Tschacher offers to let Agent Fox check out J & T's prime bank sources. He also encloses what he describes as "a news publication from the International Chamber of Commerce (ICC) in Paris describing subject financial instruments, which are commonly issued by top prime banks in Europe and resold into the secondary market in the U.S. through investment houses like Payne–Webber [sic], Goldman Sachs, etc." Also enclosed is a purported translation of portions of the "Euro Money Letter" (which may or may not be an ICC publication—I cannot tell from perusing the document). While Tschacher, not Joschko, wrote the memo and forwarded the documents, he was Joschko's partner. J & T was based in Houston, and under U.S. law, one partner's knowledge about their business affairs is attributable to the other. At the very least, if defendant had possessed this memorandum he could have (1) cross examined Joschko, the writer's partner, about whether FBI inquiries were directed to J & T concerning the bona fides of the underlying transaction; or (2) determined to call Tschacher as a witness on that subject.[8] Tschacher's obvious knowledge about prime bank instrument scams might also have been used to undermine Joschko's testimony that he was unaware that prime bank swindles were widespread by 1994.

While it is hardly a smoking gun, I conclude that this memorandum should

have been disclosed as potential impeachment material under *Brady.*

### F. The Form 71 and its Attachments are not Brady *Material.*

Next is the Form 71 (Complaint) prepared by the intake agent at FBI: Houston, which describes J & T's complaint as being directed to TCB's "accidental" wiring of the money to Davidson. The document, of course, must be read in its entirety to assess whether or not it is exculpatory. In its entirety, it lists the subject of the complaint as defendant and reads as follows:

> Attached are ten (10) sheets consisting of several letters to the U.S. Secret Service, Comptroller of the Currency/Complaint Specialist, Irvin Davidson and Texas Commerce Bank. The letters and other pertainant [sic] information were written by the complainant and G.A. Joschko, the European Managing Director of J & T Financial Partners, Inc., 12118 Briar Forest, Houston, TX 77077. The complainant alleges that the captioned subject stole $250,000 in international securities from his company.

Davidson is the "captioned subject."

Attached to this manifestly non-exculpatory memorandum is a letter written to the Secret Service on J & T Financial Letterhead (presumably by Tschacher, although the name is whited out). This letter indicates that TCB "accidentally" released the $250,000. But again, it does so in the context of the following sentence: "*We have been defrauded by Irvin Davidson* currently residing at 152 Grand View Avenue in 10952 Monsey, New York State in the amount of US-$250,000 which was accidentally released by our Bank for a Security Transaction to the amount of US-$79 Million." (Ex M to Defendant's Motion for

---

8. No one has ever suggested that Tschacher was unavailable to testify.

a New Trial) (Emphasis added). Notwithstanding Davidson's efforts to make Tschacher's use of the phrase "accidentally released by our Bank" exculpatory to him, there is nothing exculpatory about this document, which sets forth a detailed complaint of fraud against Davidson and asks the Secret Service to investigate Davidson and obtain a refund of J & T's money. Davidson's argument that these documents could have been used to bolster his cross-examination of Joschko, based on Josckho's use of the word "accidentally" in relation to conduct by TCB (not Davidson) is completely illogical.

Even if the content of the Form 71 and Tschacher's letter could be characterized as *Brady*, there would be no *Brady* violation because defendant had those documents in his possession during the trial. Agent Fox testified that among the documents originally sent to Agent Paridisio was Serial No. 1. Serial No. 1 is the Form 71 in question. Apparently Davidson also had the ten letters attached to the Form 71 prior to receiving the entire FBI: Houston file in 2002, as a result of his FOIA request, because the letter from Tschacher to the Secret Service is included in the appendix to his appeal with the marking "Gov. Exhibit 6–12." (Appendix to defendant's appeal p. 141).

### G. The Barclays "Issued" Memos are not Brady *Material*

The next allegedly exculpatory documents are those either stating or implying that Barclays Bank was to be the "issuer" of the securities that were the subject of the J & T/Investco transaction. These documents purportedly justify Davidson's skepticism and render rational his request for compliance with a non-contractual term—written confirmation from Barclays concerning the existence of the prime bank instruments [9]—before he would go forward with the deal.

The "issuer" documents are not exculpatory. The alleged wire fraud was perpetrated on or about March 31, 1994, when Davidson removed the money that had been posted as a performance bond from the TCB account; the alleged money laundering took place within the next few days. The Barclays "issuer" documents post-date the dates on which the crimes were allegedly committed. Trial exhibit GX 6–6, which contains Davidson's demand that Barclay's issue confirmation of the existence of the eurobonds, was not written until over two months after the commission of the J & T crimes as alleged in the indictment and proved at trial. The Barclays "issuer" documents could hardly be exculpatory, since they do not indicate that Davidson harbored any suspicion about Barclays' role in the transaction at the time he took custody of the money and moved it through his own accounts.

### H. The "Potential Littigation Scenario" Memorandum is Jencks *Material But Not* Brady *Material*

■ Finally, there is the "Potential Littigation [sic] Scenario" memorandum. (DX R). This memo, apparently in Joschko's handwriting, is alleged to be useful fodder for cross-examination, since it outlines a strategy by which J & T would use evidence from a criminal litigation in a civil lawsuit against Davidson.

---

**9.** The contract (GX–1) was in evidence. On its face it contains no term requiring confirmation from Barclays (the bank for General Atlantic, which was identified as the Primary Provider)—or for that matter, from the Primary Provider (which is apparently what Davidson argues Barclays was, based on the use of the word "issuer")—of the existence of the eurobonds. It does, by contrast, contain a term requiring Davidson's Bank (defined at ¶ 23 as a "major U.S. securities firm,"—i.e., an investment bank—which is referred to subsequently as "this Bank") to issue a confirmation of the existence of funds in the form attached as Exhibit B.

While the Government is indeed correct that a victim's bias against a defendant who defrauded him is self-evident (which means that material like this memorandum is in the nature of "belt-and-suspenders" evidence), the document could indeed have been used on cross-examination to establish bias if Joschko had indicated that he harbored none. Moreover, the memo, being in Joschko's handwriting, was a prior statement of a witness, which the Government was required to turn over as 3500 material. 18 U.S.C. § 3500(b).

However, it did not violate *Brady* for the Government not to turn over this memorandum. The withheld memorandum suggests bias, but so did the memorandum from Joschko's partner Tschacher to Agent Fox, which was offered by the defense and admitted into evidence as DX ZZ.[10] Indeed, the sentiments expressed in DX ZZ, suggest that, more than bias, Joschko and Tshacher had a downright animus for Davidson. The memorandum states:

SUBJECT: $250,000 grand theft, wire fraud, conspiracy.

Dear Mrs. Fox,

attached is some additional documentation and communication concerning the Davidson case. He is consistently unavailable and his wife in the meantime hangs up the phone on me. In my eyes that makes her a co-conspirator. Please inform me about the status and progress of your work.

Best regards,

Klaus Tschacher [Signed]

cc: Irwin Davidson—If you want the mother of your children to go to jail instead of you—just carry on. [Signed] Klaus Tschacher

Alex Joschko

Mordechai Templeman

(DX ZZ). After having Joschko read the "cc" note, Mr. Abrams pointed to Mrs. Davidson in the gallery of the courtroom and asked Joschko, "Is that the mother of the children that Mr. Tschacher is referring to there, sir?" (Tr. 725). More than an attempt to show bias, Abrams hoped that this testimony would portray Joschko and Tschacher as loathsome individuals who were prepared to harm an innocent mother in pursuit of filthy lucre.

In short, the jury had before it ample evidence of Joschko's bias. The "Potential Litigation Strategy" memorandum would have merely been more of the same. As such, it is purely cumulative impeachment material, and the Government's failure to produce it does not violate *Brady*. See *Shabazz v. Artuz*, 336 F.3d 154, 166 (2d Cir.2003); *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir.1998) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."); *Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir.1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.").

### 4. Whether Viewed Individually or in the Aggregate, the Undisclosed Brady Material Does Not Warrant a New Trial.

■ Looked at individually, the few items of undisclosed *Brady* material do not

---

10. As noted above, defendant also had in his possession during trial (GX 6–12) a letter from Tschacher to the Secret Service in Houston asking for the Agency to use its "good office" to investigate Davidson for wire fraud and theft, in connection with the J & T transaction. (Ex M to Defendant's Motion for a New Trial).

mandate a new trial, even on the J & T wire fraud and money laundering counts.

First, the legible SWIFT in and of itself does not warrant a new trial. The fact that Davidson sent a legible copy of the SWIFT to Joschko does not mean that he caused a *contract-complying* SWIFT to be sent to Barclays.

Trial exhibit GX 6–1, the agreement between J & T and Investco, sets forth exactly what Davidson was contractually required to do. His obligation was to secure the availability of $81 million in funds, then to issue a conditional SWIFT in the amount of the invoice price and send the SWIFT to Barclays. The SWIFT in the FBI: Houston file tracks the wording mandated by Exhibit B to the parties' contract (GX 6–1), and it has a text block on the top of each page identified as the "application header block" that contains a line indicating "To: Barclays Bank PLC (All U.K. Offices) London." From that, a jury could infer that someone sent a SWIFT to Barclays Bank—although the header is suspicious on its face, referring as it does to "All U.K. Offices" rather than to a particular office or account.

However, the terms of the contract require that the SWIFT come from a "major U.S. securities firm." [11] The testimony at the trial—some of it adduced from Davidson's own witness, some of it adduced from Joschko—was that Davidson (1) did not have an account at Kidder Peabody or the ability to obtain the funding required by the contract from Kidder Peabody (Tr. 1300–01), and (2) did not cause Kidder to send Exhibit B confirmation of funding to Barclays, but rather caused "a Russian bank" to do so.

More important, however, is the fact that Davidson had in his possession throughout the trial a copy of the SWIFT that he purportedly sent both to Joschko and to Barclays—DX TT, which was marked and used on Joschko's cross. Defendant did not need to see the undisclosed copy of this document from the FBI: Houston file in order to place before the jury a SWIFT wire that both conformed to Exhibit B of GX 6–1 and contained page headings apparently indicating that the document was directed to Barclays. Evidence is not considered suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known of the essential facts permitting him to take advantage of that evidence." *United States v. Torres*, 129 F.3d 710, 717 (2d Cir.1997).

Of course, Joschko denied having seen DX TT, either in whole or in part.[12] But whether he saw it or not, or for that matter whether what he saw was legible or not, would appear to be beside the point. What Davidson claims the undisclosed

11. Sitting as the proverbial thirteenth juror, as I do in deciding whether evidence warrants a new trial, *United States v. Ferguson*, 246 F.3d 129, 137 (2d Cir.2001), I conclude that Davidson is incorrect that the contract permits him to use any bank, including a Russian bank, to satisfy his funding obligation in connection with the J & T transaction. Paragraph 2.3 of GX 6–1 requires J & T to use for the transaction an Investco (i.e., Davidson) account established within a "major U.S. securities firm." Later in the same paragraph the "major U.S. securities firm" is referred to as "this Bank" (capital B), and Exhibit B to the contract identifies Kidder Peabody as the "major U.S. securities firm/Bank" in question. Investco's obligation was to instruct its "Bank" (the major U.S. securities firm that was contractually required to be used for the transaction, not some mythical bank-in-the-air) to take certain actions to further the transaction.

12. As I have already said, I cannot conclude, as the thirteenth juror, that Joschko perjured himself on this point. His testimony, which is all I care about, is ambiguous, and the parties were apparently content to let it remain ambiguous.

copy of the SWIFT shows is that *he sent the document to Barclays*. If it does, then the source of that revelation lies in the reference to Barclays in the "application header block" at the top of each page. That same reference must also appear on DX TT, since the parties appear to agree that the last four pages of DX TT are identical to the undisclosed SWIFT in the FBI: Houston files. As long as Davidson possessed DX TT—and there is no question that he did—he could have used it to ask the jury to reach the conclusion he now urges on me—that the document means it was in fact sent to Barclays, and that Davidson thus did what was required of him under the contract.[13]

Furthermore, if Davidson were correct about the Russian bank argument, he could have established his compliance with the contract by subpoenaing the document from Barclays. Information that could have been obtained by subpoena from an independent source is not considered suppressed, even if the Government had it and failed to disclose it. *United States v. Rodriguez–Andrade*, 62 F.3d 948, 952 (7th Cir. 1995).

So what could the SWIFT in Agent Fox's file accomplish that could not have been accomplished either by introducing Davidson's own copy of the SWIFT (DX TT) or by obtaining proof of compliance from Barclays? It could have been used to establish that Joschko was lying when he said (1) he did not see the DX TT (if

that is indeed what he said), or (2) the copy of the SWIFT that he received was not legible. Neither of those facts tends to prove that Davidson complied with his obligations under the contract. Indeed, in the non-impeachment sense of the word "exculpatory," the fact that Joschko had the four pages of the SWIFT in his file at one point in time—and that those pages were more legible than not—is not exculpatory at all, in the sense of tending to show Davidson's innocence. It certainly does not undermine the Government's theory that Davidson never really intended to perform under the contract, but rather intended to "manufacture" a breach (J & T's purported failure to provide proof of the existence of the eurobonds, something that was not required under the literal terms of the contract) so that he would have an excuse to keep the money he had taken from J & T before any contract was signed!

Neither does Tschacher's April 13, 1995 memo to Fox warrant a new trial. On its face, the document neither exculpates Davidson based on his (defendant's) own conduct nor "proves" his defense that he was being defrauded—a defense that is no defense at all, since bad faith by J & T would not excuse Davidson's committing wire fraud by spiriting away the performance bond nine days before he was contractually entitled to do so.[14] The fact that

---

**13.** I have asked both sides to provide me with a copy of DX TT, which defendant had in his possession and used during the trial but which was not introduced into evidence. Neither side can find it. I have no reason to conclude that four of its five pages are not identical in every respect—including the suspicious Barclay's header—to the document that Joschko sent to Agent Fox.

**14.** Davidson's "no harm/no foul" argument— that he did nothing wrong by taking the money prematurely, even if it technically violated

the terms of the parties' contract, because either he was entitled to the $250,000 or to millions in profits on the deal if it had been consummated—is, with respect, ridiculous. It is an illogical argument because, if the deal was never consummated because Davidson himself breached the contract (assuming he had any intention to go through with the transaction in the first place), the performance bond should have been returned to J & T. And it assumes the one thing that can never be assumed in a financial transaction—certainty that money will be made.

an FBI agent asks questions about someone's conduct (as obviously occurred here) is simply not proof of wrongdoing.

As far as the "Potential Littigation [sic] Scenario" document goes, no one could reasonably conclude that the result in the case would have been different if this memo (non-disclosure of which violated the Jencks Act, not *Brady*) had been in Mr. Abrams' hands during the trial. As incentive to explore the issue of bias, Mr. Abrams had both the self-evident fact that Joschko believed himself a crime victim (one who had complained to the Government about it) and the reports of those complaints: DX ZZ in evidence and GX 6–12, that defendant chose not to introduce. Joschko's animus toward Davidson is apparent from the face of those documents.

Finally, taking these three documents together,[15] I still cannot conclude that there is a reasonable probability that the jury would have reached a different result on the J & T wire fraud counts if they had been disclosed.[16] None of these documents is "exculpatory" in the sense of containing evidence that directly undermines the Government's case or proves Davidson's actual innocence. Furthermore, the most damning evidence in connection with the J & T transaction was the fact that Davidson took the $250,000 a week before he had even signed the contract with J & T—and well before he was contractually entitled to do so—and spent it on himself (by transferring it to the account of Interlotto, a British lottery company unrelated to the J & T deal, in which he had an interest).

### 5. Even if the Undisclosed Brady Material Warranted a New Trial on the Counts Relating to J & T, It Does Not Warrant Vacatur of the Conviction on Any Other Counts.

Finally, assuming arguendo that the conclusions set forth above are incorrect and warrant granting a new trial on the counts of conviction relating to J & T (Counts 2 and 10), there is no basis upon which to vacate Davidson's conviction on the remaining counts of conviction.

Davidson's argument is essentially the familiar "lynchpin" argument—that J & T was the lynchpin of the entire fraudulent scheme that undergirded Count 1, the tax conspiracy count, as well as the remaining wire fraud and money laundering counts. Davidson grounds this argument in two propositions: (1) the J & T transaction yielded most of the money relevant to the counts of conviction ($250,000 out of a total of $306,000 that Davidson was convicted of laundering); (2) the J & T deal was the crux of the Government's "conspiracy" scheme, because it epitomized Davidson's modus operandi and was one of only three non-time-barred transactions allegedly part of the scheme that were charged as substantive frauds and submitted to the jury. Davidson also argues that the rest of the Government's case was close and the Government's proof correspondingly thin, so that spillover effect from the conviction on the J & T counts infects all remaining counts of conviction.

I disagree with all of defendant's arguments.

In assessing a claim of prejudicial spillover, a court looks to several factors to

---

**15.** In performing the "cumulative effect" analysis required by *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), I need not consider material that the Government would have had no obligation to turn over even if it had possessed the FBI: Houston file.

**16.** Since the money laundering count depended on a finding that the $250,000 was the fruit of specified unlawful activity (wire fraud), I focus on the wire fraud count of conviction.

determine whether the totality of the circumstances requires reversal of the remaining counts. *United States v. Morales,* 185 F.3d 74, 82 (2d Cir.1999), *cert. denied,* 529 U.S. 1010, 120 S.Ct. 1282, 146 L.Ed.2d 229 (2000). Courts examine (1) whether the evidence on the vacated counts was of such inflammatory nature that it would have tended to incite or arouse the jury into convicting on the remaining counts and (2) whether evidence and facts pertaining to dismissed counts was similar to or different from those relating to the other counts. The Court must also make a general assessment of the strength of the Government's case on the remaining counts.

■ The J & T evidence, while powerful enough to convict Davidson, can hardly be described as "inflammatory." In fact, nothing about the evidence introduced in support of any of Counts 1 through 12 (conspiracy to commit tax fraud, wire fraud, and money laundering) lives up to the label of "explosive" that defendant assigned to it on direct appeal. (*See* Ex. T to Defendant's Motion for New Trial at p. 91). This was a so-called "paper case," consisting of technical evidence about the making of contracts and the movement of money through various bank accounts. It was, in short, the sort of evidence through which many jurors find it hard to stay awake.

Moreover, the evidence relevant to the other wire fraud and money laundering counts of conviction is readily separable from the evidence the jury used to convict defendant on the J & T counts. The remaining wire fraud and money laundering counts relate to transactions other than J & T. Counts 3 through 9, the other wire fraud counts of conviction, relate to the Tilley and Pacific transactions and have nothing whatever to do with J & T. Similarly, Counts 11 and 12, the other money laundering counts, relate solely to the Pacific deal. The evidence of fraud in each case is wholly independent of the evidence of fraud involving J & T.

It is true that all three transactions follow a common pattern—Davidson's insistence on the posting of a performance bond by a contract contra party, followed by the declaration of a breach and the sudden disappearance of the performance bond into Davidson's personal bank account, for his personal use—and the Government argued that the pattern could be discerned by looking at the evidence as a whole. But there was a body of evidence particular to each charged transaction (time-barred or not) that had nothing to do with any other deal and that could be separated out and considered on its merits. And specific indicia of fraud relied on by the Government in connection with J & T, such as the sending of an illegible fax, was of no relevance to either the Tilley or Pacific transactions, which underlay the other substantive counts of conviction.[17] The fact that J & T involved substantially more money than Tilley or Pacific does not mean that the jury found defendant guilty of J & T and then drew conclusions about Davidson's conduct in the latter transactions from the former.

The Government's evidence regarding wire fraud involving Tilley and Pacific, and its evidence of money laundering involving Pacific, was anything but thin. As I concluded in the post-trial motions, it was overwhelming. Nothing in defendant's motion papers suggests otherwise, and nothing in the FBI: Houston file addresses either of those deals or undermines any of the independent evidence that was in-

---

**17.** Thus, defendant's effort to have me draw some conclusion about prejudicial spillover as to Tilley or Pacific from the late disclosure of the London & Wessex faxes—which supposedly put the lie to the "pattern of illegible faxes" argument—is absolutely unavailing.

troduced in support of the Government's case on those deals.

If his conviction on the J & T counts were vacated, Davidson's conviction of wire fraud relating to Tilley and Pacific is sufficient to sustain his conviction on the conspiracy count (Count 1) of the indictment. The jury were instructed that it could convict the defendant on Count 1 only if Davidson were first convicted of *one non-time barred overt act.* (Tr. 1857–61). In connection with the Tilley and Pacific transactions, Davidson was convicted of a total of seven non-time barred overt acts. On top of that, there was substantial evidence of fraud on Davidson's part relating to the other transactions that were cited as part of his tax evasion conspiracy—transactions like Aaron, U–Trade, and Peruvian Rice Growers—which could not be indicted as substantive wire frauds because the statute of limitations had expired.[18]

Finally, defendant has propounded no argument whatever tending to show that his conviction on the three tax evasion counts should be overturned. The evidence that Davidson lived in Monsey, New York, but paid no income taxes—either in the United States or anywhere else—was as strong as any evidence of tax evasion that has ever been presented to this Court. I am no more persuaded that the defendant was convicted of tax evasion based on prejudicial spillover from the "explosive" evidence of wire fraud and money laundering in connection with the J & T transaction than was the Second Circuit when defendant made the same argument based on evidence relating to all the wire fraud and money laundering charges. (Ex. T to Defendant's Motion for a New Trial). The evidence of defendant's "Man Without A County" efforts to evade paying income tax lawfully due from him was arguably the most "explosive," not to say inflammatory, evidence introduced at his trial.

### 6. The Chase Bank Documents Are Not Newly Discovered Evidence

██ Finally, Davidson claims that documents he subpoenaed from Chase Bank—which did not arrive until after the trial—would have discredited Joschko's testimony concerning the source of funds used for the posting of the performance bond. The short answer to defendant's complaint that these documents constitute "newly discovered evidence" is that they are not newly discovered at all. Defendant has known about them for years. Furthermore, these are not documents that were withheld by the Government. They could reasonably have been obtained by the defense earlier than they were, so that they could have been used at trial for whatever they were worth. At no time during the trial did defense counsel apprise the Court that documents subpoenaed from a third party had not been produced. The trial went on for some weeks; the Court could have called Chase Bank in and demanded compliance, or even entertained an application for a brief adjournment if the subpoenaed documents were not forthcoming. Evidence that could reasonably have been obtained in time for use at trial is not "newly discovered evidence" within the meaning of Rule 33. *See, e.g., United States v. White,* 972 F.2d 16, 20 (2d Cir.1992); *Sanders v. Sullivan,* 863 F.2d 218, 226 (2d Cir.1988); *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987).

### CONCLUSION

For the foregoing reasons, the defendant's motion for a new trial is denied.

---

18. As found above, the presence of documents relating to Peruvian Rice Growers—one of the time-barred transactions that were cited as overt acts under Count 1—in the FBI: Houston file is simply not evidence that Davidson did nothing wrong in connection with that deal:

This constitutes the decision and order of the Court.